# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

LUIS SAEZ,
     *Plaintiff*,

    v.

JAIME LETTIERI,
     *Defendant.*

No. 3:21-cv-00915 (VAB)

## RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

Luis Saez ("Plaintiff") has sued Jaime Lettieri, Chief Judicial Marshal of the New Haven[1] Judicial District ("Defendant") in her individual capacity under 42 U.S.C. § 1983 for an equal protection violation. *See* Am. Compl., ECF No. 2 (Jul. 6, 2021) ("Am. Compl.").

Chief Judicial Marshal Lettieri has filed a motion for summary judgment. *See* Mot. for Summ. J., ECF No. 67 (Jul. 1, 2024).

For the following reasons, Chief Judicial Marshal Lettieri's motion for summary judgment is **GRANTED.**

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background[2]

Mr. Saez, a Hispanic male, used to work as a judicial marshal in the Centralized Transportation Unit ("CTU"). Statement of Material Facts, ECF No. 67-2 ¶¶ 1, 2 ("Def. SMF"); Statement of Material Facts, ECF No. 72-3 at ¶ 1 ("Pl. SMF").

---

[1] Although Chief Judicial Marshal Lettieri no longer holds this position, the Court will continue to refer to her by the title, which prompted the underlying claim.

[2] Unless noted otherwise, the following factual statements are taken from portions of the Defendant's Statement of Material Facts that Plaintiff has admitted to be true, *see* Pl. SMF at 1–3, or from the Plaintiff's Statement of Material Facts.

In 2013, he was transferred from the Judicial District of Fairfield to the Judicial District of New Haven. Pl. SMF ¶ 3. At that time and through 2018, Chief Judicial Marshal Lettieri, the Chief Judicial Marshal in the Judicial District of New Haven, supervised Mr. Saez. Def. SMF ¶ 6; Pl. SMF ¶¶ 4, 5. Chief Judicial Marshal Lettieri is a white, non-Hispanic female. Pl. SMF ¶ 4. While in the CTU, Mr. Saez "was responsible for transporting prisoners to and from courthouses and medical institutions in the western region of Connecticut." Def. SMF ¶ 3; Pl. SMF ¶¶ 5, 6. Mr. Saez "consistently had positive employment performance evaluations, and is a highly competent and valuable employee." Pl. SMF ¶ 2.

In 2018, Mr. Saez worked with a partner, Judicial Marshal Andre Wright, who is a Black male. Pl. SMF ¶ 9; Def. SMF ¶ 24. On or about May 1, 2018, Deputy Chief Jeannie Valente notified Chief Judicial Marshal Lettieri that a prisoner transport vehicle did not arrive at York Correctional Institute as scheduled. Def. SMF ¶ 11. When she checked the global positioning system ("GPS") for the vehicle, it appeared to have stopped at a restaurant. Def. SMF ¶ 12.

Chief Judicial Marshal Lettieri reported to Director of Judicial Marshal Services O'Donovan Murphy, a non-Hispanic male, that the vehicle, which was driven by Mr. Saez and Mr. Wright, made an unauthorized stop.[3] Pl. SMF ¶¶ 10, 11; Def. SMF ¶¶ 17–20. At Director Murphy's instruction, Chief Judicial Marshal Lettieri then checked the GPS for the vehicle the week before, and Chief Judicial Marshal Lettieri learned that the vehicle had made several other stops during the week of April 23, 2018. Def. SMF ¶¶ 18–19. Chief Judicial Marshal Lettieri reported her findings to Director Murphy. Def. SMF ¶ 20.

---

[3] The parties dispute the extent to which the stop was "unauthorized." Chief Judicial Marshal Lettieri points to Judicial Branch Policy 210-01, Section 4(G)(3), *see* ECF No. 67-3 at 45 ("Transport staff shall ensure that the vehicle does not make unscheduled stops"), and asserts that unauthorized stops are prohibited. Def. SMF ¶ 15. Mr. Saez argues that he was informed by supervisors during his training that "it was acceptable as past practice to stop while on a route to pick up meals or drinks to be consumed at the courthouse if no prisoners were present in the vehicle." Pl. SMF ¶ 15.

2

Jon-Paul Lucas, Program Manager I of the Court Operations Personnel Services Unit, investigated unauthorized stops that Mr. Saez's vehicle had made from April 23, 2018 to May 11, 2018. Def. SMF ¶ 21. During this time, Mr. Saez worked with Mr. Andre Wright, except on April 23, 2018, when he worked with Judicial Marshal Victor Davila. Def. SMF ¶ 24. Mr. Lucas learned that Mr. Saez made approximately 31 stops not associated with any assigned duties that ranged from four to twenty-three minutes. Def. SMF ¶ 25, 26; ECF No. 67-3 at 36–37. Mr. Saez did not ask for permission to make the stops. Def. SMF ¶ 29.

Mr. Saez, along with his non-white partners, Mr. Wright and Mr. Davila, were punished for making unauthorized stops. Def. SMF ¶ 31; Pl. SMF at 2 ("Black and Hispanic JMs Wright and Davila were also punished along with the Hispanic plaintiff.").

Before this incident, from 2013 through 2018, Mr. Saez made stops for lunch and was not disciplined. Def. SMF ¶¶ 45, 46. Pl. SMF ¶ 29. Before he worked with Mr. Wright, Mr. Saez worked with Judicial Marshal Dan Murzin, a white male, and Mr. Saez and Mr. Murzin made stops for food without punishment. Pl. SMF ¶¶ 28, 29.

Other non-Hispanic judicial marshals—specifically, Andrew Broder, Chris Kane, Ronald Charligio—stopped for meals without facing discipline.[4] Pl. SMF ¶¶ 14, 19, 32–35, 38, 39; Def SMF ¶¶ 37–39. Other non-Hispanic judicial marshals in different districts were allowed to stop for meals, and some had written permission to do so from their supervisors. Pl. SMF ¶¶ 16, 19; Def SMF ¶¶ 53–56.

---

[4] The parties dispute whether Chief Judicial Marshal Lettieri was aware that Mr. Broder, Mr. Kane, and Mr. Charligio made unauthorized stops. Mr. Saez alleges that Chief Judicial Marshal Lettieri was aware that Mr. Broder and Mr. Kane regularly stopped for food because she has GPS data on their vehicles. Pl. SMF ¶ 34. Chief Judicial Marshal Lettieri alleges that it was her regular practice "to only check GPS of CTU vehicles on an as-needed basis, such as when a vehicle had not arrived as scheduled," Def SMF ¶ 13, and that she was not aware that these individuals had made unauthorized stops. Def SMF ¶¶ 38, 40, 42.

Chief Judicial Marshal Lettieri reported unauthorized stops made by Judicial Marshals Wilson and Frost, Black males; Judicial Marshal Trevor Brittell, a white male; and Judicial Marshal Gervacio Negron, a Hispanic male. Def SMF ¶ 50–51.

On May 11, 2018, Mr. Saez received a letter notifying him that he may face discipline for unauthorized stops. Def. SMF ¶ 22; ECF No. 67-3 at 35. After reporting Mr. Saez, Chief Judicial Marshal Lettieri gave testimony and provided evidence in the investigation against him and participated in one of the investigatory interviews of Mr. Saez. Pl. SMF ¶ 22. As Mr. Saez's supervisor, Chief Judicial Marshal Lettieri could decide "whether or not to seek discipline against a judicial marshal on the basis of unauthorized stops, and in particular, to seek discipline against [Mr. Saez]." Pl. SMF ¶ 23.

On July 5, 2018, Mr. Saez received a letter informing him that he was being suspended for five days without pay for making unauthorized stops for food from April 23, 2018 to May 11, 2018. Pl. SMF ¶ 31; ECF No. 72-6 at 1–2. On July 10, 2018, Mr. Saez received a written reprimand alleging he failed to provide a doctor's note about his absence on June 8, 2018. Def. SMF ¶ 57; ECF No. 67-3 at 48. Deputy Chief Jeannie Valente reported Mr. Saez's unauthorized absence to Personnel Manager Maria Wells. Pl. SMF ¶¶ 32, 58. Deputy Chief Valente also reported the unauthorized absence of Judicial Marshal Gogliettino, a white male. Def. SMF ¶ 64. On July 11, 2018, Mr. Saez filed Union Grievances challenging both his suspension and the written reprimand. Pl. SMF ¶ 44; ECF No. 72-6 at 3, 5.

On October 3, 2018, Mr. Saez's suspension and written reprimand were referenced in his Employee Performance Appraisal. Def. SMF ¶ 64; Pl. SMF ¶ 42. Mr. Saez received an overall satisfactory rating that was completed by Deputy Chief Valente and approved by Chief Judicial Marshal Lettieri. Def. SMF ¶ 66. Supervisors at CTU should note discipline on their employee's

performance appraisals, even when the discipline is the subject of a pending union grievance. Def. SMF ¶ 68. Mr. Saez is not aware of any other judicial marshals who were disciplined, but did not have that discipline reflected in their Employee Performance Appraisal. Def. SMF ¶ 70. Chief Judicial Marshal Lettieri has referenced disciplinary action in Employee Performance Appraisals for non-Hispanic employees, including Christopher Dadio and Kevin McGrath, who are white males. Def. SMF ¶¶ 71–73.

After his Employee Performance Appraisal, Mr. Saez applied for a promotion to Sergeant but was not hired despite passing the exam. Pl. SMF ¶ 43.

On April 2, 2019, Mr. Saez filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") alleging that his suspension without pay and poor performance review were motivated by racial animus. ECF No. 72-4.

On January 1, 2020, after approximately twenty years of working as a judicial marshal, Mr. Saez retired. Pl. SMF ¶ 2.

On September 1, 2020, Chief Judicial Marshal Lettieri retired. Def SMF ¶ 5.

### B. Procedural History

On July 6, 2021, Mr. Saez filed his Complaint, and that same day, an Amended Complaint alleging various claims against Chief Judicial Marshal Lettieri; the State of Connecticut Judicial Branch; and Tais C. Ericson, Executive Director of Court Operations (collectively, "Defendants"). Am. Compl.

On August 16, 2022, U.S. District Judge Jeffrey Alker Meyer granted in part and denied in part the Defendants' motion to dismiss, and dismissed all claims except Mr. Saez's Section 1983 equal protection claim against Chief Judicial Marshal Lettieri. Order, ECF No. 25 ("Order re MTD").

On November 2, 2023, Chief Judicial Marshal Lettieri filed an Answer to the Amended Complaint. Answer, ECF No. 55.

On July 1, 2024, Chief Judicial Marshal Lettieri moved for summary judgment. Mot. for Summ. J., ECF No. 67; Mem. In Supp. of Mot. for Summ. J., ECF No. 67-1 ("Def. Mem."); Def. SMF.

On December 4, 2024, Chief Judicial Marshal Lettieri filed a response seeking summary judgment against Mr. Saez in light of his failure to respond to the motion for summary judgment. Reply, ECF No. 68.

On January 17, 2025, following the unfortunate passing of Judge Meyer, the case and all outstanding motions were transferred to this Court. Order of Transfer, ECF No. 69 (Jan. 17, 2025).

On January 17, 2025, Mr. Saez sought an extension of time to respond to the motion for summary judgment. Mot. for Ext. of Time, ECF No. 70.

On January 27, 2025, the Court granted the extension of time *nunc pro tunc*. Order, ECF No. 71.

On February 14, 2025, Mr. Saez filed a response to the motion for summary judgment. Obj. re Mot. for Summ. J., ECF No. 72; Mem. In Supp., ECF No. 72-1 ("Pl. Mem."); Pl. SMF.

On March 10, 2025, Chief Judicial Marshal Lettieri filed a reply in support of the motion for summary judgment. Reply, ECF No. 75 ("Reply").

## II.    STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute

of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48.

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* (internal quotation marks omitted). "If the evidence is merely colorable, or is not significantly probative,

summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967) and *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of New York*, 874 F.3d 338, 343, 347 (2d Cir. 2017) ("On a motion for summary judgment, the court must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'"). A court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials, *see Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), and will grant summary judgment only "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250.

## III.    DISCUSSION

Chief Judicial Marshal Lettieri argues that summary judgment should be granted against Mr. Saez's equal protection claims because (1) the claims are time-barred, and (2) Mr. Saez fails to show that he was treated differently than similarly situated coworkers due to his race.

The Court will address each argument in turn.

### A.  The Statute of Limitations Period

The limitations period for filing a § 1983 action in Connecticut is three years. *See Thompson v. Rovella*, 734 F. App'x 787, 788–89 (2d Cir. 2018). While federal courts look to state law to determine the applicable limitations period, federal law controls when the cause of action accrues. *See Wallace v. Kato*, 549 U.S. 384, 388 (2007) ("While we have never stated so expressly, the accrual date of a § 1983 cause of action is a question of federal law that is *not* resolved by reference to state law.").

Under federal law, a cause of action accrues—and the statute of limitations begins to run—"when the plaintiff can file suit and obtain relief." *Id.* (internal quotation marks and citation omitted). Thus, the Court must determine when Mr. Saez possessed sufficient facts about the harm done to him that reasonable inquiry would reveal the cause of action. *See United States v. Kubrick*, 444 U.S. 111, 122–24 (1979).

Chief Judicial Marshal Lettieri argues that Mr. Saez's claims are time-barred because he knew he faced potential discipline in May 2018, but did not bring suit until July 2021, which is outside the three-year statute of limitations. Def. Mem. at 4–5.[5]

In response, Mr. Saez argues that Chief Judicial Marshal Lettieri's reporting of the unsupervised stops in May 2018 was part of a continuing course of conduct leading to his discipline in July 2018, and "[e]ven if certain conduct occurred more than three years prior to filing, '[u]nder [the continuing violation] doctrine, if a plaintiff has experienced a continuous practice and policy of discrimination, the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'" Pl. Mem. at 25 (quoting *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001) (internal quotation marks omitted)).

The Court agrees.

While Mr. Saez was notified that he may face discipline in May 2018, he did not actually face discipline until July 5, 2018, when he received written notice that he would be suspended for his unauthorized stops. *See* Pl. SMF ¶ 3. As a result, the three-year statute of limitations period did not lapse on the filing of Mr. Saez's lawsuit until July 5, 2021, and even Chief Judicial Marshal Lettieri agrees that Mr. Saez filed his lawsuit by that date. Def. Mem. at 3–4 ("Plaintiff filed the instant lawsuit on July 5, 2021.") (citation omitted).

---

[5] When ECF-generated page numbers differ from internal page numbers, the ECF-generated page numbers are used.

Accordingly, the lapsing of the statute of limitations period is no basis for dismissing Mr. Saez's claims.

### B.  The Merits of the Equal Protection Claims

The Equal Protection Clause of the Fourteenth Amendment protects public employees from discrimination on the basis of a protected class, including race. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 82 (2d Cir. 2015). Public employees may bring discrimination claims under 42 U.S.C. § 1983 against "responsible persons acting under color of state law." *Id.* at 87. Any state employee "acting in his official capacity" acts "under color of state law." *Id*. at 88 (internal quotation marks omitted). An individual may only be held liable under Section 1983 "if that individual is personally involved in the alleged deprivation." *Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015) (internal quotation marks omitted).

Disparate treatment claims are analyzed under the burden-shifting analysis set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). Under this framework, a plaintiff must first establish a prima facie case of intentional discrimination by showing that "(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination." *Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) (internal quotation marks omitted).

To make a showing of disparate treatment as part of a prima facie case, a plaintiff must show that she is "similarly situated in all material respects to the individuals with whom [she] seeks to compare [herself]." *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003). "What constitutes all material respects . . . varies," but a court must evaluate "(1) whether the plaintiff

and those [s]he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (internal quotation marks omitted). While the comparator's situation need not be functionally identical to that of the plaintiff, "[t]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases." *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 493–94 (2d Cir. 2010). Although the question of whether comparators are similarly situated is typically a question of fact for the jury, a court may "properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Harlen Assocs. v. Inc. Vill. Of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001).

In cases involving allegations of disparate treatment in workplace disciplinary proceedings, a comparator's underlying misconduct must be substantially similar to that of the plaintiff. *Brown v. City of Syracuse*, 673 F.3d 141, 151 (2d Cir. 2012) (finding in dicta that plaintiff making Title VII and Section 1983 equal protection claim needed to point to comparators of other races who were not suspended despite also being at "the center of a missing persons investigation" and exhibiting "behavior comparable to his" in that context); *Ruiz*, 609 F.3d at 495 (explaining that none of plaintiff's comparators were similarly situated partially because none of them "were accused of sexual harassment, sexual abuse and rape" like plaintiff); *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1280 (11th Cir. 2008), *overruled in part on other grounds by Pearson v. Callahan,* 555 U.S. 223 (2009) ("A comparator is an employee similarly situated to the plaintiff in all relevant respects. The quantity and quality of the comparator's

misconduct must be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.") (internal quotation marks omitted).

Once the plaintiff makes out a prima facie case, "the burden shifts to the employer to articulate 'some legitimate, nondiscriminatory reason for the adverse employment action.'" *Cortes v. MTA New York City Transit*, 802 F.3d 226, 231 (2d Cir. 2015) (quoting *Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 92 (2d Cir, 2013) (internal citations omitted)). "The employer's burden, however, is 'not a demanding one[.]' The employer 'need not prove the absence of discriminatory motive or that the [adverse employment decision] was motivated by a legitimate reason.' Instead, the employer need only articulate 'legitimate nondiscriminatory reasons [that are] clear and specific.'" *Martinez v. City of Stamford*, No. 3:20-CV-00174 (JCH), 2022 WL 824638, at *4 (D. Conn. Mar. 17, 2022), *aff'd*, No. 22-702-CV, 2023 WL 3162131 (2d Cir. May 1, 2023) (citations omitted) (alterations in original).

The burden then shifts back to the plaintiff to demonstrate that "the employer's explanation is a pretext" for discrimination and that membership in the protected class was the real reason for the adverse action. *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014). This burden requires a plaintiff to "establish that the defendant's discriminatory intent was a 'but-for' cause of the adverse employment action or the hostile environment. It is insufficient to establish simply that invidious discrimination was 'a motivating factor' of the offending conduct. As a result, a court considering a § 1983 claim at summary judgment must determine whether, construing the evidence in a light most favorable to the plaintiff, a reasonable jury could find that the adverse employment action would not have occurred 'but-for'" the plaintiff's protected characteristic. *Naumovski v. Norris*, 934 F.3d 200, 214 (2d Cir. 2019)

(citations omitted). The Second Circuit clarified that the burden is higher for § 1983 claims than for Title VII claims.

> [A]t the third step of the *McDonnell Douglas* analysis, a plaintiff asserting a § 1983 claim bears a higher burden in establishing that the employer's alternative, nondiscriminatory reason for the adverse employment action is "pretextual." To establish "pretext" under Title VII, a plaintiff need only establish "that discrimination played a role in an adverse employment decision." In other words, a Title VII plaintiff need only prove that the employer's stated non-discriminatory reason was not the exclusive reason for the adverse employment action. By contrast, to establish "pretext" under § 1983, a plaintiff must establish that the employer's stated reason would not, alone, constitute a sufficient basis for pursuing an adverse action. In other words, a § 1983 plaintiff must establish that the employer's stated non-discriminatory reason is either false or inadequate to support the adverse employment action.

*Id.* at 214–15 (2d Cir. 2019).

Mr. Saez alleges two adverse employment actions under circumstances that give rise to the inference of discrimination: (1) his July 5, 2018 suspension for making unauthorized stops, Pl. SMF ¶ 31; and (2) his written reprimand for his absence on June 8, 2018 without a proper doctor's note, Def. SMF ¶ 57. Chief Judicial Marshal Lettieri does not challenge that Mr. Saez is a member of a protected class, was qualified for the position he held at the time, or that he was subject to adverse action. She does, however, challenge whether Mr. Saez can establish a prima facie case of intentional discrimination for either adverse action.

The Court will address each issue in turn.

### 1. The July 5, 2018 Suspension Issue

A plaintiff need not present direct evidence of discrimination to establish discriminatory intent, instead, "'[a] plaintiff may support an inference of race discrimination by demonstrating that similarly situated employees [not in the protected class] were treated more favorably.'" *Baity v. Kralik*, 51 F.Supp.3d 414, 445 (S.D.N.Y. 2014) (citations omitted).

> An employee is similarly situated to co-employees if they were (1) "subject to the same performance evaluation and discipline standards" and (2) "engaged in comparable conduct. [T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." In other words, the comparator must be similarly situated to the plaintiff "in all material respects."

*Ruiz*, 609 F.3d at 493–94 (quoting *Graham*, 230 F.3d at 40 and *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)) (internal citations omitted).

Nevertheless, "although a comparator must be similarly situated to [plaintiff] in material respects, as discussed above, they need not be identically situated." *Radwan v. Manuel*, 55 F.4th 101, 138 (2d Cir. 2022) (citing *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 n.11, (1976)). In *Radwan*, the Second Circuit "reject[ed] any contention that, to survive summary judgment, [plaintiff] was required to demonstrate that a proposed comparator committed the exact same misconduct as she did or to present an identical factual analog to her situation." *Id.* at 138.

Chief Judicial Marshal Lettieri claims that Mr. Saez fails to show that he was reported for unauthorized stops due to his race because she reported non-Hispanic judicial marshals for unauthorized stops, and that during his deposition, Mr. Saez testified that "he had frequently stopped to get food with Hispanic and non-Hispanic partners and had never been disciplined before[,]" and because "it is undisputed that making stops for food in a transport vehicle violated the Judicial Branch's policy, which Chief Judicial Marshal Lettieri was required to report." Def. Mem. at 7–9.

Mr. Saez argues, however, that "[t]he myriad of similarly situated comparators set forth by the plaintiff readily demonstrate a pattern of disparate treatment based upon race; to wit, white, non-Hispanic Judicial Marshals routinely and openly engaged without ramification in the

14

*identical* conduct for which the plaintiff was punished and suspended" Pl. Mem. at 16 (emphasis in original).

Chief Judicial Marshal Lettieri responded that Mr. Saez did not sufficiently raise disputed issues of material fact regarding comparators but instead entirely relies on "on his own deposition testimony, his affidavit to the Connecticut Commission on Human Rights and Opportunities, his responses to Defendant's interrogatories, and hearsay statements from other Judicial Branch employees. For example, Mr. Saez supports the 'fact' that stopping for food was a widespread practice solely with alleged hearsay statements from other judicial marshals." Reply at 3 (citing Pl. SMF ¶¶ 34, 38).

The Court agrees.

On this record, it is undisputed that Mr. Saez failed to arrive timely at the York Correctional Institute, Def SMF ¶ 11, a tardiness that prompted a review of where he had been instead, which resulted in the disclosure of his unauthorized stops. And, there is nothing in this record—indeed, Mr. Saez has offered nothing in his testimony or otherwise—from which a reasonable juror could conclude that a judicial marshal of any race or ethnicity can make unauthorized stops, be late arriving to their assigned destinations, and not be disciplined. On this basis alone, Mr. Saez has failed to create a genuine issue of fact that similarly situated employees of a different race or ethnicity were treated more favorably. *See Price v. Cushman & Wakefield, Inc.*, 808 F.Supp. 2d 670, 685 (S.D.N.Y. 2011) ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.") (citing *Anderson*, 477 U.S. at 256–57 and *Gross v. Nat'l Broad. Co.*, 232 F.Supp.2d 58, 67 (S.D.N.Y. 2002)).

On this record, there also is not admissible evidence connecting any alleged racial disparity with respect to discipline for unauthorized stops. A party must support each fact with "admissible evidence (when presented at trial in the form of testimony or other permissible method) in the record tending to prove each such fact, *e.g.,* deposition testimony, admissions, answers to interrogatories, affidavits, etc." *Jackson v. Federal Exp.*, 766 F. 3d 189, 194 (2d Cir. 2014); *see also Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.") (citing *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)); *eCommission Solutions, LLC v. CTS Holdings, Inc.*, No. 18-1672-cv, 2019 WL 2261457, at *2 (2d. Cir. May 28, 2019) (finding that "the admissibility of evidence on a motion for summary judgment is subject to the same rules that govern the admissibility of evidence at trial") (citations omitted); *Scheiner v. Wallace*, No. 93 CIV. 0062 (RWS), 1996 WL 633418, at *8 (S.D.N.Y. Oct. 31, 1996) (granting a motion for summary judgment where Plaintiffs introduced admissible evidence that did not create a genuine issue of material fact).

A plaintiff's testimony alone, if based on speculation and inadmissible hearsay, "is similarly insufficient to form a basis to conclude that [a defendant's action] was racially-motivated." *Baity*, 51 F. Supp. 3d at 451 (citing *Taylor v. Potter*, No. 99-CV-4941, 2004 WL 1811423, at *16–*19 (S.D.N.Y. Aug. 16, 2004), *aff'd* 148 Fed. App'x 33 (2d Cir. 2005) (summary order)).

As supporting evidence as to his alleged comparators, Mr. Saez provides only his deposition testimony. *See* Pl. Dep., ECF No. 72-3 (Feb. 14, 2025). In this testimony, he discusses the opinions of two white male judicial marshals. *See* Pl. Dep. 44:11–45:25 ("I can't believe you guys got in trouble, We stop every morning to get our breakfast also."); Pl. Dep. 48:18–49:8

("Oh, wow, you guys got in trouble when we do the same thing all the time."). Mr. Saez, however, does not provide affidavits from these two individuals nor any documentation to support his claim that they made frequent stops. In other words, he has offered only hearsay that other white judicial marshals were able to make unauthorized stops without discipline.

In evaluating comparators, "although a comparator must be similarly situated to [plaintiff] in material respects, as discussed above, they need not be identically situated." *Radwan*, 55 F.4th at 138 (citations omitted). But, as noted above, there is no record evidence that any comparators who stopped without authorization had committed other misconduct that might subject them to increase scrutiny, such as failing to arrive at a scheduled destination.

Indeed, as even Mr. Saez himself admits, there is record evidence that before the discovery of his unauthorized stops, he had worked with other Hispanic male judicial marshals, had made unauthorized stops, and had not been disciplined. *See* Pl. Dep. 37:5–37:24 ("Q: [Y]ou were a judicial marshal in New Haven for about six years. Is that accurate? A: That's correct. Q: . . . So, during those six years, were you ever partnered with a Hispanic male? A: Yes."); *id.* at 37:20–37:24 (Q: . . . Was the discipline in July of 2018 the first discipline that you had received for making unauthorized stops? A: Yes.").

And Chief Judicial Marshal Lettieri provided evidence that, in 2015, she reported two white male judicial marshals for making an unauthorized stop when she received a call that their van was observed outside a Burger King. Mot. 8; *see also* Ex. A, Lettieri Aff. 15 (copying an e-mail sent by Chief Judicial Marshal Lettieri in April 2015 reporting the unauthorized stop). In other words, two individuals who were not part of Mr. Saez protected class but were found to have committed some sort of misconduct—that is, they were caught—were also disciplined.

In any event, even if Mr. Saez was able to demonstrate a prima facie case of discrimination, his claim would still fail. Chief Judicial Marshal Lettieri has met her burden to "articulate 'legitimate nondiscriminatory reasons [that are] clear and specific.'" *Martinez*, 2022 WL 824638, at *4, *aff'd*, 2023 WL 3162131 (citations omitted). Authorized stops were prohibited under Judicial Branch Policy 210-01, Section 4(G)(3), and the policy's implementation was prompted by Mr. Saez's undenied tardiness. Mr. Saez thus must show that Chief Judicial Marshal Lettieri's explanation was a "pretext," *Kirkland*, 760 F.3d at 225, and "that the employer's stated non-discriminatory reason is either false or inadequate to support the adverse employment action." *Naumovski*. 934 F.3d at 215. There must be sufficient "evidence from which a jury could infer that the individual's discriminatory intent was a *but-for cause* of the adverse employment action." *Id.* (emphasis in original).

For the same reasons discussed above, however, Mr. Saez cannot meet this burden: he has no record evidence that discipline from an unauthorized stop resulting in tardiness is connected to his race or ethnicity. *See Baity*, 51 F.Supp.3d at 450 ("The absence of adequate comparators . . . makes it even more difficult for Plaintiff to demonstrate that he would have been treated differently if he had been a different race."); *see also id.* at 451 ("Plaintiff's testimony, even if believed, is inadmissible hearsay, and in the absence of any corroborating testimony is insufficient to form a basis to conclude that [the adverse employment action] was racially motivated.").

Accordingly, any equal protection claim based on his July 5, 2018 suspension for making unauthorized stops will be dismissed.

### 2.  The July 10, 2018 Written Reprimand Issue

"[A] plaintiff must plead and prove 'that each government-official defendant, through the

official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d

609, 618 (2d Cir. 2020) (quoting *Ashcroft v.* Iqbal, 556 U.S. 662, 676 (2009)). While "[t]he

factors necessary to establish a [Section 1983] violation will vary with the constitutional

provision at issue," *id.* (internal quotation marks and citation omitted), "[t]he violation must be

established against the supervisory official directly." *Id.* As a result, a plaintiff "must therefore

establish that [the government official] violated the [constitutional provision at issue] by [the

government official's] own conduct, not by reason of [the government official's] supervision of

others who committed the violation." *Id.* at 619.

And, as discussed above, for this particular alleged constitutional violation—violation of

Mr. Saez's constitutional right to equal protection of the laws, employment discrimination on the

basis of his race or ethnicity—there must be sufficient "evidence from which a jury could infer

that the individual's discriminatory intent was a *but-for cause* of the adverse employment

action." *Naumovski*. 934 F.3d at 215 (emphasis in original).

Chief Judicial Marshal Lettieri argues that she was not personally involved in the

investigation or discipline that led to Mr. Saez's July 10 written reprimand for taking an

unauthorized sick day, and thus did not cause this alleged violation of his constitutional right to

equal protection. *See* Def. Mem. at 9–10. Mr. Saez does not include any arguments to the

contrary. He "[d]enie[s]," Pl. SMF ¶ 62, that Chief Judicial Marshal Lettieri "was not involved in

the investigation or discipline of Plaintiff with regard to "the June 8, 2018 absence," Def. SMF ¶

62, but offers no evidence to support this denial. In contrast, Chief Judicial Marshal Lettieri

offers both her own affidavit and the testimony of Ms. Maria Wells, who was the Personnel

Manager for the Court Operations Personnel Services Unit in 2018. Wells Aff. ¶ 4, ECF No. 67-

5 (July 1, 2024). In her capacity as Personnel Manager, Ms. Wells was involved in assigning and

reviewing workplace misconduct allegations and recommending discipline when appropriate. *Id.* ¶ 5. Ms. Wells testified, "[a]lthough [Chief Judicial Marshal Lettieri] was included in Deputy Chief Valente's initial report of suspected misconduct," which resulted in the July 10, 2018 written reprimand, Chief Judicial Marshal Lettieri "had no role in the pre-disciplinary meeting or in the imposition of the written reprimand." *See id.* ¶ 29.

In the absence of any admissible evidence that Chief Judicial Marshal Lettieri had any involvement in the written reprimand of July 10, 2018, Mr. Saez has failed to create a genuine issue of material fact as to this issue. *See Jackson*, 766 F. 3d at 194 (requiring "admissible evidence (when presented at trial in the form of testimony or other permissible method) in the record tending to prove each such fact, *e.g.,* deposition testimony, admissions, answers to interrogatories, affidavits, etc."). As a result, there is no viable equal protection claim based on the written reprimand of July 10, 2018. [6]

Accordingly, in the absence of any viable equal protection claim, either based on the July 5, 2018 suspension, or the July 10, 2018 reprimand, Chief Judicial Marshal Lettieri's motion for summary judgment as to Plaintiff's equal protection claims will be granted.[7]

---

[6] While Chief Judicial Marshal Lettieri includes an argument in her brief as to a retaliation claim against her, because the only references to retaliation, Am. Compl. at 1 (referencing "retaliation" in Count One, the employment discrimination claims under federal and state statutes), are to claims long ago dismissed, *see* Order re MTD at 13 (dismissing "all claims other than Saez's equal protection claim against defendant Chief Judicial Marshal Lettieri"), the Court need not and does not address this claim.

[7] Because the Court has dismissed Mr. Saez's equal protection claim on the merits, the Court need not and does not fully address whether Chief Judicial Marshal Lettieri is entitled to qualified immunity. Nevertheless, for both the July 5, 2018 suspension issue, and the July 10, 2018 written reprimand issue, the Court is aware of no clearly established law that, given her very limited role, *see* Def. SMF ¶ 10 ("Employment misconduct investigations and decisions pertaining to employee discipline were handled by Court Operations.") (citations omitted), one without any authority to make the adverse employment action, she could have the requisite "personal involvement" for an equal protection claim alleging employment discrimination. *See Pearson v. Callahan*, 555 U.S. 223, 244 (2009) (recognizing that the qualified immunity "inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.") (internal quotation marks and citations omitted). Indeed, on this record, it is not clear how Chief Judicial Marshal Lettieri, who did not initiate the investigation into the July 5, 2018 incident (an investigation with undisputed factual findings about lateness and unauthorized stops), and had no authority to determine any discipline for either the July 5, 2018 incident, or the July

## IV.    CONCLUSION

For the foregoing reasons, Chief Judicial Marshal Lettieri's motion for summary

judgment is **GRANTED**.

The Clerk of Court is instructed to enter judgment for Chief Judicial Marshal Lettieri, and

to close this case.

**SO ORDERED** at New Haven, Connecticut, this 31st day of March, 2025.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE

---

10, 2018 incident, discriminated against Mr. Saez. As a result, even if the Court had not dismissed the equal protection claim on its merits, qualified immunity would have attached to shield Chief Judicial Marshal Lettieri from liability. *See id.* at 231 ("The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.") (internal quotation marks and citation omitted).